**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **LUIS A. RODRIGUEZ-OCASIO; CRYSTAL BALLY-CHOONOO; and JOYCE R. LINIS,** ***on behalf of themselves and those similarly situated,*** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **MIDLAND CREDIT MANAGEMENT, INC., and JOHN DOES 1 to 10,** <br><br> **Defendants.** | **Civil Action: 17-3630 (ES) (MAH)** <br><br> **OPINION** |

**SALAS, DISTRICT JUDGE**

Plaintiffs Luis A. Rodriguez-Ocasio, Crystal Bally-Choonoo, and Joyce R. Linis sue Defendant Midland Credit Management, Inc. ("MCM") on behalf of themselves and others similarly situated for violating the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. (D.E. No. 8, First Amended Complaint ("FAC")). Currently before the Court is MCM's motion to compel arbitration of Plaintiffs' claims on an individual basis and dismiss the FAC. (D.E. No. 57). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). As set forth below, the motion is DENIED.

## I. BACKGROUND

### A. Factual Allegations

As alleged in the FAC, Plaintiffs "incurred or owed certain financial obligations arising

from" certain accounts, "which were primarily for [their] personal, family, or household purposes" (the "Accounts"). (FAC ¶ 13). Plaintiffs further maintain that the Accounts were assigned to or placed with MCM for collection when they "were past-due and in default." (*Id.* ¶¶ 15–16). MCM sought to collect those debts by mailing collection letters to Plaintiffs. (*Id.* ¶¶ 17, 20 & 23; D.E. No. 8-1, May 27, 2016 collection letter to Rodriguez-Ocasio; D.E. No. 8-2, May 27, 2016 collection letter to Linis; D.E. No. 8-3, August 29, 2016 collection letter to Bally-Choonoo). Those letters, the FAC alleges, were initial communications between MCM and Plaintiffs. (FAC ¶¶ 18, 21 & 24). The collection letters did not include "a statement that, upon the consumer's written request within [thirty days after the receipt of this notice], the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor." (*Id.* ¶ 28 (quoting § 1692g(a)(5))). Such a statement, the FAC goes on, is required under § 1692g(a)(5) in an initial written communication between a debt collector and a consumer, and it is the policy and practice of MCM to send initial written communications without such a statement. (*Id.* ¶¶ 29 & 52). In bringing their claim under the FDCPA, Plaintiffs seek to represent a class consisting of:

> All natural persons with an address within . . . the State of New Jersey, to whom, from May 20, 2016 through the final resolution of this case, Defendant sent one or more letter(s) in an attempt to collect a consumer debt, which failed to include the statement required by 15 U.S.C. § 1692g(a) and/or 15 U.S.C. § 1692g(a)(5).

(*Id.* ¶ 32).

**B. Procedural History**

On August 23, 2017, MCM filed a motion to compel arbitration (D.E. No. 6), which it withdrew after Plaintiffs amended their complaint (D.E. Nos. 8, 10 & 11). On October 11, 2017, MCM renewed its motion. (D.E. No. 12). In a Letter Order dated June 18, 2018, the Court denied

MCM's motion without prejudice to renew it after the parties undertook limited discovery "to ascertain whether a valid agreement to arbitrate exists between the parties." (D.E. No. 24).

That limited discovery is now complete, and MCM once again seeks to compel arbitration. Under the agreements governing the Accounts, MCM argues, all claims related to the Accounts must be submitted to binding arbitration upon request of either party, and Plaintiffs waived their right to bring class action claims. MCM has included the operative agreements for each of Plaintiffs' Accounts as exhibits to its motion. One such agreement contains the following provision:

> **RESOLVING A DISPUTE WITH ARBITRATION**
> **PLEASE READ THIS SECTION CAREFULLY. IF YOU DO NOT REJECT IT, THIS SECTION WILL APPLY TO YOUR ACCOUNT, AND MOST DISPUTES BETWEEN YOU AND US WILL BE SUBJECT TO INDIVIDUAL ARBITRATION. THIS MEANS THAT: (1) NEITHER A COURT NOR A JURY WILL RESOLVE ANY SUCH DISPUTE; (2) YOU WILL NOT BE ABLE TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING; (3) LESS INFORMATION WILL BE AVAILABLE; AND (4) APPEAL RIGHTS WILL BE LIMITED.**
>
> - **What claims are subject to arbitration**
>   1. **If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or dealers/merchants/retailers that accept the card or program sponsors if it relates to your account, except noted below.**
>   2. **We will not require you to arbitrate: (1) any individual case in small claims court or your state's equivalent court, so long as it remains an individual case in that court; or (2) a case we file to collect money you owe us. However, if you respond to the collection lawsuit by claiming any wrongdoing, we may require you to arbitrate.**
>   3. **Notwithstanding any other language in this section, only a court, not an arbitrator, will decide disputes about the validity, enforceability, coverage or scope of this section or any part thereof (including, without**

> **limitation, the next paragraph of this section/or this sentence). However, any dispute or argument that concerns the validity or enforceability of this Agreement as a whole is for the arbitrator, not a court, to decide.**
>
> - **No Class Actions**
>   **YOU AGREE NOT TO PARTICIPATE IN A CLASS, REPRESENTATIVE OR PRIVATE ATTORNEY GENERAL ACTION AGAINST US IN COURT OR ARBITRATION. ALSO, YOU MAY NOT BRING CLAIMS AGAINST US ON BEHALF OF ANY ACCOUNTHOLDER WHO IS NOT A ACCOUNTHOLDER ON YOU ACCOUNT, AND YOU AGREE THAT ONLY ACCOUNTHOLDERS ON YOUR ACCOUNT MAY BE JOINED IN A SINGLE ARBITRATION WITH ANY CLAIM YOU HAVE.**

(D.E. No. 57-2, Ex. A, Rodriguez-Ocasio Agreement, Car Care Account, at 3; *see also* D.E. No. 57-8, Ex. G, Rodriguez-Ocasio Agreement, Walmart Account; D.E. No. 57-12, Ex. K, Rodriguez-Ocasio Agreement, TJX Account; D.E. No. 57-16, Ex. O, Linis Agreement, Old-Navy Account; D.E. No. 57, Ex. T, Bally-Choonoo Agreement, JC Penny Account (collectively, "Account Agreements")).[1]

To prove that it acquired the rights to enforce the arbitration provisions, MCM supplied the bills of sale of the Accounts between Midland Funding, LLC ("Midland")—which MCM services—and the original creditor, Synchrony Bank ("Synchrony"). (D.E. No. 57-28, Ex. 1, Bill of Sale, Car Care Account; D.E. No. 57-29, Ex. 2, Bill of Sale, Walmart, TJX, and Old Navy Accounts; D.E. No. 57-30, Ex. 3, Bill of Sale, JC Penny Account). Meanwhile, Plaintiffs supplied the "FORWARD FLOW RECEIVABLES PURCHASE AGREEMENT" between Midland and Synchrony for each of the Accounts, all of which contain the following provision:

> Purchase and Sale. On each Transfer Date, Seller shall sell and Buyer shall buy all right (including the right to legally enforce, file

[1] All the agreements are subject to similar arbitration provisions. The parties do not appear to dispute that any slight variation in the arbitration provisions are material to the present motion.

> suit, collect, settle or take any similar action with respect to such Receivable), title and interest in and to the Receivables with respect to which Buyer has received a Notification File.

(D.E. No. 59-4, Ex. A, § 2.1; D.E. No. 59-4, Ex. B, § 2.1; D.E. No. 59-6, Ex. C, § 2.1 (collectively, "Purchase Agreements")). The Purchase Agreements further define "Account" to mean "any credit account owned by Seller with respect to which there is a Receivable," and define "Receivable" to mean "any credit account receivable that is being sold to Buyer pursuant to the terms of this Agreement, as such receivable exists as of the Cut-Off Date, to the extent such receivable is set forth on the applicable Notification File." (*Id.* § 1.1).

## II. LEGAL STANDARD

Where the Court must refer beyond the pleadings to decide a motion to compel arbitration, the motion is properly analyzed under the summary judgment standard. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). Summary judgment is proper where the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In ruling on the motion, the Court views the evidence in the light most favorable to the nonmoving party and draws all inferences in favor of that party. *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-movant. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). At the summary judgment stage, the Court is not permitted to make credibility determinations or weigh the evidence. *Id.* at 428–29. In the context of a motion to compel arbitration, "summary judgment is not warranted" where "'the party opposing arbitration can demonstrate, by means of citations to the record,' that there is 'a genuine dispute

as to the enforceability of the arbitration clause.'" *Guidotti*, 716 F.3d at 776 (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).

## III. DISCUSSION

The Federal Arbitration Act (the "FAA") "reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'" *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003)). "Before compelling a party to arbitrate pursuant to the FAA, a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009). A court is required to order that the parties proceed with arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. By contrast, "[i]f a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999). The "presumption in favor of arbitration 'does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'" *Kirleis*, 560 F.3d at 160 (quoting *Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)). Nevertheless, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

At issue here is whether the arbitration provisions of the Account Agreements bind Plaintiffs to arbitrate claims that they have against MCM. MCM argues that it is entitled to compel arbitration because it is an agent of Midland and Midland purchased the rights to enforce

arbitration from Synchrony. (D.E. No. 57-37 ("Mov. Br.") at 19–30).[2] Plaintiffs respond that Synchrony did not transfer its right to compel arbitration to Midland through the Purchase Agreements—because the Purchase Agreements transferred only rights under the "Receivables," not under the "Accounts." (D.E. No. 59 ("Opp. Br.") at 9–27).

MCM asserts, and Plaintiffs appear not to dispute, that New Jersey law governs the interpretation of the Purchase Agreements. (Mov. Br. at 19–20).[3] "Consistent with basic contract law," New Jersey courts interpret a contract "not [for] the real intent" of the parties "but [for] the intent expressed or apparent in the writing." *Leodori v. CIGNA Corp.*, 175 N.J. 293, 300, 814 A.2d 1098 (2003) (quoting *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*, 168 N.J. 124, 135, 773 A.2d 665 (2001)). Although a contract should be read for its plain and ordinary meaning, *Kieffer v. Best Buy*, 205 N.J. 213, 223, 14 A.3d 737, 743 (2011), a court may conduct a "thorough examination of extrinsic evidence in the interpretation of contracts" so long as such evidence is used only to shed light on the true meaning of the terms of the contract, *Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 269, 901 A.2d 341 (2006).

The plain meaning of the Purchase Agreements indicates that Midland did not purchase and was not assigned the right to compel arbitration. Section 2.1, as indicated, states:

> On each Transfer Date, Seller shall sell and Buyer shall buy all right (including the right to legally enforce, file suit, collect, settle or take any similar action with respect to such *Receivable*), title and interest in and to the *Receivables* with respect to which Buyer has received

[2] Because MCM did not properly paginate its moving brief, the Court relies on the pagination automatically generated by CM/ECF.

[3] The Court is skeptical of whether New Jersey law applies here: § 12.6 of the Purchase Agreements says that "THIS AGREEMENT SHALL BE . . . CONSTRUED IN ACCORDANCE WITH[] THE LAWS OF THE STATE OF NEW YORK." Further, the Court notes that MCM dedicates much of its moving brief to arguing this issue under Utah law. (Mov. Br. at 19–21 & 26). However, Utah law expressly covers the underlying Account Agreements (*see* Account Agreement at 3)—not the Purchase Agreements—and the Court here is concerned with properly interpreting the Purchase Agreements. Moreover, despite the Court's skepticism, MCM agrees that New Jersey law governs the interpretation of the Purchase Agreements. (*See* Mov. Br. at 19–20 ("While the FAA governs the enforceability of the Arbitration Provisions according to their terms, state law, here, New Jersey, governs the determination of whether valid agreements to arbitrate exist.")).

a Notification File.

(emphasis added). Similarly, those agreements are titled "FORWARD FLOW *RECEIVABLES* PURCHASE AGREEMENT" (emphasis added). Meanwhile, the Purchase Agreements do not specify that Synchrony transferred the "Accounts" or "Account Agreements" to Midland. The difference between an "Account" and a "Receivable" is material because § 1.1 of the Purchase Agreements suggests that a "Receivable" is a subpart of an "Account." That section defines "Account" as "any *credit account* owned by Seller with respect to which *there is a Receivable*," and defines "Receivable" as "any *credit account receivable* that is being sold to Buyer pursuant to the terms of this Agreement, as such receivable exists as of the Cut-Off Date, to the extent such receivable is set forth on the applicable Notification File." (Purchase Agreements § 1.1 (emphasis added)). The general right to compel arbitration is a feature of the "credit account," not the "credit account receivable that is being sold to Buyer pursuant to the terms" of the Purchase Agreements, and Plaintiffs FDCPA claim does not pertain to Midland's rights "with respect to such Receivable."

Other courts interpreting similar contractual provisions have reached the same conclusion. *See Garcia v. Midland Funding, LLC*, No. 15-6119, 2017 WL 1807563, at *3 (D.N.J. May 5, 2017) (explaining that "even with a 'healthy regard for the strong federal policy in favor of arbitration,' the Agreement did not clearly convey the right to demand individual arbitration" because it conferred rights associated with the "Receivable," not the "Account," and the "right to compel arbitration for Plaintiff's FDCPA claim is not associated with legally enforcing, filing suit, collecting, settling, or a similar action with respect to the receivable"); *Lester v. Portfolio Recovery Assocs., LLC*, No. 18-0267, 2018 WL 3374107, at *7 (N.D. Ala. July 11, 2018) ("The declaration also contradicts the Bill of Sale attached thereto, which purports to convey only 'receivables.'

PRA has cited no evidence that the right to arbitrate was transferred, or that it was Synchrony's intent to transfer to PRA the right to arbitrate."). Meanwhile, courts within the Third Circuit that have reached a different conclusion interpreted contracts that specifically transferred the rights to the underlying accounts. *See Bowker v. Midland Funding, LLC*, No. 18-11320, 2020 WL 5743044, at *2 (D.N.J. Sept. 25, 2020) ("The clear language of the Purchase Agreement, however, states that Midland Funding purchased 'all right (including the right to legally enforce, file suit, collect, settle or take any similar action with respect to such Account), title and interest in and to the Account.'" (citation omitted)); *Clemons v. Midland Credit Mgmt., Inc.*, No. 18-16883, 2019 WL 3336421, at *4 (D.N.J. July 25, 2019) ("Comenity sold to Midland Funding LLC . . . Plaintiff's account, and the Bill of Sale provides, '[Comenity]' hereby assigns effective as of the Closing Date of August 31, 2017 all rights, title and interest of [Comenity] in and to those Charged-off Accounts . . . for all purposes.'" (citation omitted)); *Lance v. Midland Credit Mgmt. Inc.*, No. CV 18-4933, 2019 WL 2143362, at *5 (E.D. Pa. May 16, 2019) ("Section 2.1 of the Purchase Agreement shows it bought 'all right' to Mr. Lance's 'Account . . . .'"); *cf. Morrison v. Midland Funding, LLC*, No. 20-6468, 2021 WL 2529618, at *5 (W.D.N.Y. June 21, 2021) ("There is no question that upon assignment, Midland Funding stepped into the shoes of Synchrony when it purchased "all rights, title and interest in the *Account*." (emphasis added)); *Blaine v. Pressler & Pressler, LLP*, No. A-2289-11T2, 2013 WL 2359729, at *2 (N.J. Super. Ct. App. Div. May 31, 2013) (explaining "that Chase, or, in this case Midland, as a '*purchaser of [the][a]ccount*,' [is] entitled to require arbitration of any claim arising from or relating to the Cardmember Agreement" (emphasis added)).

Although MCM does not clearly say so, Plaintiffs understand it to argue that extraneous evidence—specifically, the affidavits of Angel Nayman, an employee of Synchrony, and Sean

Mulcahy, an employee of MCM—establish that Synchrony intended to transfer MCM all rights under the Account Agreements. (Opp. Br. at 14 (citing Mov. Br. at 26)). As noted, New Jersey law permits the use of extraneous evidence to illuminate the meaning of otherwise clear text. *See Conway*, 187 N.J. at 270. "Such evidence may 'include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct.'" *Id.* at 269 (quoting *Kearny PBA Local # 21 v. Town of Kearny*, 81 N.J. 208, 221, 405 A.2d 393 (1979)). But neither affidavit offers any such insight. Rather, they merely cite the various bills of sale and Purchase Agreements and repeat MCM's litigating position, without analysis and in cursory fashion, that Midland purchased the Accounts. (D.E. No. 57-1, Angel Nayman Affidavit, ¶¶ 12, 17, 23, 30 & 37; D.E. No. 57-27, Sean Mulcahy Affidavit, ¶¶ 5–6). Thus, to the extent MCM does rely on extraneous evidence, the Court does not find such evidence persuasive.[4]

In response, MCM offers three arguments, none of which is persuasive. First, MCM argues that Plaintiffs lack standing to interpret the assignment of rights between Synchrony and Midland because Plaintiffs were not parties to the assignment. (D.E. No. 63 ("Reply") at 8 (citing *Schiano v. MBNA*, No. 05-1771, 2013 WL 2452681, at *25 (D.N.J. Feb. 11, 2013))). But *Schiano* involved an instance where, unlike here, "[a]s a result of the assignment contract, Obligor's rights and duties under the underlying contract remain the same." 2013 WL 2452681, at *26. Meanwhile, Plaintiffs' rights under the Account Agreements would materially change under MCM's understanding of the Purchase Agreements because Plaintiffs could be compelled by a third-party

[4] If New York law applies, the result is the same because New York law holds that contract interpretation is governed by the contract's text, and not extraneous evidence, unless the text is ambiguous. *See Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244, 21 N.E.3d 1000 (2014).

to arbitrate their FDCPA claims and would no longer be able to use the Rule 23 device in federal court against that third-party.

Second, MCM argues that "[w]hen a creditor assigns its right to receive payment on an outstanding debt, the assignee stands in the shoes of the assignor with respect to the debt." (Reply at 8 (quoting *Holland v. LVNV Funding, LLC*, No. 16-0069, 2016 WL 6156187, at *9 (W.D. Ky. Oct. 21, 2016))). Thus, it follows, "a transfer of accounts receivable includes the transfer of the underlying contractual terms, including arbitration provisions." *Holland*, 2016 WL 6156187, at *7 (quoting *Martin v. Cavalry SPV I, LLC*, No. 13-0088, 2014 WL 1338702, at *6 (E.D. Ky. Mar. 31, 2014)). In reaching that conclusion, *Holland* relied on *Martin*, which relied on Kentucky's codification of former § 9-318(1)(a) of the U.C.C. *See Martin*, 2014 WL 1338702, at *5–6; *see also Stratton v. Portfolio Recovery Assocs., LLC*, 706 F. App'x 840, 846 (6th Cir. 2017) (same).

However, that interpretation of the U.C.C. is not persuasive. Now codified as § 9-404, that provision says:

> (a) **[Assignee's rights subject to terms, claims, and defenses; exceptions.]** Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (e), the rights of an assignee are subject to:
>
> > (1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and
> >
> > (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

§ 9-404 (emphasis added), *codified as* N.J.S.A. § 12A:9-404. Midland has not offered a New Jersey case standing for the proposition that § 9-404 does not allow an assignor and assignee to agree to a partial assignment in which the latter purchases only some rights of the former under

the original contract.[5] And the plain language of § 9-404 does not support that interpretation. By specifying that "the rights of an assignee are *subject to*," § 9-404 unequivocally conditions the rights of the *assignee* (MCM) on the claims and defenses that the account debtor (Plaintiffs) had against the assignor (Synchrony). Said another way, § 9-404 protects the rights of the account debtor, not the assignee. An official comment to § 9-404 supports that reading: "[L]ike former Section 9-318(1), [this section] provides that an assignee generally takes an assignment subject to defenses and claims of an account debtor." § 9-404 cmt. 2.

Moreover, § 9-405 of the U.C.C. appears to contradict the broad proposition, espoused by MCM, that an assignee automatically stands in the shoes of the assignor and thereby receives all rights of the assignor. Subject to certain conditions, § 9-405 allows an assignor and an account debtor to modify an "assigned contract"—i.e., a contract that was already assigned—without the assignee's consent. *See* § 9-405, *codified as* N.J.S.A. § 12A:9-405. If in some circumstances an assignor and an account debtor can retroactively modify and limit the rights of an assignee, then an assignee does not appear always to stand in the shoes of the assignor. Moreover, if the assignee and the account debtor can modify or limit the assignee's rights, then it is not clear why an assignor and an assignee cannot do the same.

Third, and finally, MCM argues that even if Synchrony did not assign Midland the right to compel arbitration, MCM may compel arbitration as a third-party beneficiary of the various Account Agreements. (Reply at 14–15 (citing *Schardan v. Allied Interstate, LLC*, No. 15-1613, 2017 WL 513022, at *3 (E.D. Mo. Feb. 8, 2017); *Hautz Const., LLC v. H & M Dep't Store*, No.

---

[5] The Court is not persuaded by MCM's claim that "[w]hile an assignee's rights can be no greater than those of the assignor, neither can they be any less." (Reply at 8–9 (quoting *Lech v. State Farm Ins. Co.*, 335 N.J. Super. 254, 258, 762 A.2d 269 (App. Div. 2000))). *Lech* did not offer any support for that proposition, *Lech* itself did not even apply it in the way MCM seeks for it be applied in this case, and no other New Jersey court has applied it. *See McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980) (noting that "[m]ere obiter" of a state court "may be entitled to little weight" (citation omitted)).

12-3478, 2012 WL 5880370, at *13 (D.N.J. Nov. 20, 2012))). But the cases on which MCM relies pointed to specific language in the relevant contract indicating an intent on the part of the contracting parties to extend the rights of a contracting party to the putative third-party beneficiary. Here, MCM merely points to the language in the Account Agreements that permits Synchrony to assign its rights—something the Court finds Synchrony did not do under the Purchase Agreements with respect to its right to compel arbitration. Moreover, the various arbitration provisions are quite clear with respect to who may compel arbitration: "**If either you or we make a demand for arbitration, you and we must arbitrate any dispute or claim between you or any other user of your account, and us, our affiliates, agents and/or dealers/merchants/retailers that accept the card or program sponsors if it relates to your account . . . .**" (D.E. No. 57-2, Ex. A, Rodriguez-Ocasio Agreement, Car Care Account, at 3; *accord* Purchase Agreements). Simply put, neither Midland nor MCM is a "we" with Synchrony. Nor is there evidence in the record that they are within the class of listed entities.[6]

Because Midland did purchase the rights to enforce arbitration from Synchrony, its agent MCM cannot compel arbitration of Plaintiffs' FDCPA claims.

## IV. CONCLUSION

For the above reasons, the Court DENIES MCM's motion to compel arbitration and dismiss the FAC. An appropriate Order will be entered.

Dated: August 25, 2021

*/s/Esther Salas*
Esther Salas, U.S.D.J.

---

[6] Plaintiffs raised several other arguments in opposition (Opp. Br. at 27–39), but inasmuch as the Court holds that Midland did not purchase the right to compel arbitration of Plaintiffs' FDCPA claims, the Court does not address them. Moreover, for the same reasons Midland did not purchase the right to compel arbitration, it did not purchase the right to bar class action lawsuits. The Court, therefore, rejects MCM's invocation of the class action bar contained in the underlying Account Agreements. (Mov. Br. at 32).